Onondaga Water Service Corporation, Plaintiff, v. Crown Mills, Inc., Defendant.

Onondaga Water Service Corporation, Plaintiff, v. Marcellus Paper Company, Defendant.

Onondaga Water Service Corporation, Plaintiff, v. Onondaga Paper Company, Defendant.

Supreme Court, Onondaga County, August 7, 1928.

Waters and watercourses — riparian rights — plaintiff acquired right from State to impound additional water in lake used as canal feeder — plaintiff obtained consent to withdraw 5,000,000 gallons per day — present proceeding is to acquire right to withdraw additional 6,000,000 gallons — total amount will not exceed that impounded — under Laws of 1907, chap. 371, plaintiff is required to extinguish riparian rights affected "by the proposed storage and use of said water" — plaintiff not required to condemn all water rights of defendants — condemnation of water rights affected by drainage of additional 6,000,000 gallons is sufficient — property desired was sufficiently described under Condemnation Law, § 4 — defendants did not waive objections not mentioned in brief — public use requires acquisition of additional water.

This is a proceeding to condemn the water rights of the defendants who are lower riparian owners. It appears that Otisco lake and its outlet constituted feeders for the Erie canal and that by chapter 371 of the Laws of 1907, the plaintiff was authorized to increase the storage capacity of Otisco lake and to impound therein an additional supply of water and to take therefrom water equal in amount to the additional supply so impounded. After the passage of that act the plaintiff erected its plant for the purpose of distributing water, with a capacity of 5,000,000 gallons per day and obtained consent from the defendants who are lower riparian owners to withdraw that amount daily. The present proceeding is to condemn the right to withdraw an additional 6,000,000 gallons, and the defendants contend that the plaintiff must pay for their entire riparian rights, notwithstanding a withdrawal of 11,000,000 gallons of water per day will not exhaust the amount impounded under the authority of chapter 371 of the Laws of 1907.

In that contention the defendants are not sustained, and the plaintiff is required only to pay for that which it actually takes. This conclusion is based directly upon the statute which requires the plaintiff to "extinguish the riparian rights of the owners of property upon the shores of said lake and the outlet thereof affected by the proposed storage and use of said water or obtain their consent thereto." The proper construction of that statute is that the plaintiff shall not be required to pay for the entire water rights of the defendants when it does not intend to use them. Furthermore, it is doubtful whether or not the

plaintiff could acquire the entire riparian rights of the defendants, since such acquisition is not necessary to satisfy the public use of the plaintiff.

The objection that the petition does not describe the property sought to be condemned in the manner required by section 4 of the Condemnation Law is without merit, for while that section requires a specific description of the property to be condemned, and its location by metes and bounds with reasonable certainty, the description in the petition to the effect that the property sought to be condemned is all the right, title and interest of the defendants in and to the riparian rights affected by the diversion and use by plaintiff of 6,000,000 additional gallons of water per day from Otisco lake is a sufficient compliance with the statute.

The defendants did not waive other objections raised upon the return of the notice by failing to make note of them in their brief.

The evidence establishes that public use demands the acquisition of an additional 6,000,000 gallons of water per day in order that the plaintiff may serve the public in the distribution of water.

PROCEEDING by condemnation to divert water from Otisco lake.

*George R. Fearon* and *Horace M. Stone,* for the plaintiff.

*Randall J. LeBoeuf, Jr.,* for the defendants Crown Mills and Onondaga Paper Company.

*Randall J. LeBoeuf, Jr.,* and *John C. Boland,* for the defendant Marcellus Paper Company.

EDGCOMB, J.   The plaintiff in these proceedings seeks, by condemnation, to acquire the right as against these defendants to divert 6,000,000 gallons of water per day from Otisco lake, a natural body of fresh water in Onondaga county lying between the towns of Otisco and Spafford, and extending into the town of Marcellus. The outlet of the lake, Nine Mile creek, runs northerly through the towns of Marcellus, Camillus and Geddes, and empties into Onondaga lake.   The defendants are owners of mills along this stream, and operate their machinery by water power derived therefrom.

In 1837, Nine Mile creek was taken as a feeder for the Jordan level of the Erie canal, the line of which was changed at that time. (Whitford's History of New York Canals, 153.)   At a meeting of the Canal Board of the State of New York held on the 25th day of August, 1868, a resolution was adopted approving maps, plans and estimates for converting Otisco lake into a reservoir for the Erie canal, and directing that contracts be let for such work.   In accordance therewith, in 1868 or 1869, the State constructed a dam across the creek near the foot of the lake, thereby raising the level of the water some ten feet.   Since that time the lake has been used as a canal reservoir, and the State has regulated the flow of the water by means of gates in the dam.   The canal is down the stream from defendants' mills, so that all the water

54

from the lake, whether appropriated by the State for canal purposes or not, passes defendants' doors.

The plaintiff is a waterworks corporation, incorporated under the provisions of the Transportation Corporations Law, and is engaged in supplying water to various localities in and about Onondaga county. It was organized under the name of Onondaga County Suburban Water Company in April, 1907. Shortly thereafter the Legislature passed a statute (Laws of 1907, chap. 371), which became a law on May 27, 1907, and which authorized the plaintiff to increase the storage capacity of Otisco lake, and to impound therein an additional supply of water, and to take and conduct therefrom water equal in amount to the additional supply so impounded. The act imposed certain duties and obligations upon the water company, which will be referred to later.

After the passage of this statute, the plaintiff erected a new dam at the outlet in accordance with plans approved by the State Engineer and Surveyor, and raised the level of the lake four feet, and increased its capacity over 2,000,000,000 gallons. The dam was completed in 1910, and the pipe line, which had a capacity of 5,000,000 gallons per day, and which, at that time, was more than ample to supply the needs of the localities served by the plaintiff, was constructed to the village of Minoa.

Before taking any water from the lake, the plaintiff obtained the consents of the defendants, or their predecessors in interest, to build the dam and impound the water, and to divert and take from the lake, out of the water so impounded, not to exceed an average of 5,000,000 gallons per day.

The localities served by the plaintiff are villages and hamlets lying about the city of Syracuse, all of which have no other water supply. They are growing rapidly, and the demands upon the company for more water have increased to such an extent that 5,000,000 gallons per day is inadequate to supply its customers. Accordingly, the plaintiff set about to make it possible to divert and take from the lake an additional supply of 6,000,000 gallons of water per day, making in all a total withdrawal of 11,000,000 gallons daily. Such withdrawal will not exhaust the additional supply of water which has been impounded in the lake by raising the crest of the dam in 1910. The company made application to and received the consent of the Superintendent of Public Works of the State of New York to appropriate the desired amount of water, under certain specified conditions and restrictions. The plaintiff also, pursuant to the provisions of article 9 of the Conservation Law, made application by petition to the Water Power and Control Commission for the approval of its maps, plans and

profiles for the utilization of the required additional supply of water, and, after a hearing, in which the defendants protested the right of the water company to the relief sought, that Board rendered its decision on December 14, 1927, and approved the application, including the maps and plans submitted, under certain specified conditions and restrictions. Pursuant to such consent and decision, the petitioner commenced the construction of the additional pipe line, and has built a large portion thereof, and intends in good faith to complete the same. Whether such application to the Superintendent of Public Works and to the Water Power and Control Commission was necessary need not be discussed or decided here. The fact remains that the application was made, and consent was given and has been acted upon.

Negotiations had with the defendants to obtain their consent to the withdrawal of the additional 6,000,000 gallons per day, or to purchase their riparian rights to that extent, were unavailing, and these proceedings were instituted.

The defendants appeared specially on the return day of the notice, and objected to the jurisdiction of the court to grant the judgments of condemnation which were sought. These objections were overruled, and defendants then appeared generally and served their answers, denying the right of the plaintiff to maintain these proceedings or to the relief sought. The issues raised by the petition and answer in each case came on for trial at Special Term, and the three proceedings were tried together.

The preliminary objections of the defendants were many. When it came down to the trial and the submission of the cases, while the defendants did not waive the various objections which had been raised by them, they stressed and focused their attack upon what they considered the underlying issue, viz., that before the plaintiff was entitled to divert and appropriate an additional 6,000,000 gallons of water per day, it must either obtain the consent of the defendants thereto, or, failing so to do, must acquire and extinguish the entire water power rights of the defendants upon Nine Mile creek, and not simply such rights as they had in the limited amount of water to be taken. Defendants insisted and still insist that the plaintiff must take all or none of their riparian rights.

It must be borne in mind that the diversion by the plaintiff of 11,000,000 gallons of water per day will not exhaust the contents of the lake, nor the flow of the outlet. With that amount of water going through plaintiff's pipe line every day, there will still be as much water in the lake as there was before plaintiff raised the dam in 1910, and water will continue to flow down the stream

past defendants' mills and furnish power to run their machinery. That power may be lessened, but it will not be totally destroyed.

Section 45 of the Transportation Corporations Law gives to a waterworks corporation, such as the plaintiff, the right to acquire, by condemnation, real estate, or any interest therein, necessary for the purposes of its incorporation, and the right to intercept and divert the flow of water from the lands of riparian owners, provided the parties are unable to agree upon the terms of purchase of such property or rights. That section, however, prohibits any such corporation from taking or using water from any of the canals of the State, or any canal reservoir or feeder, or any stream which has been taken by the State for the purpose of supplying any of the canals with water. Plaintiff, therefore, had no right to take or use the water in Otisco lake, unless the prohibition above mentioned was lifted. It was to do away with this inhibition that chapter 371 of the Laws of 1907 was passed. Whatever claim the water company has to the waters of Otisco lake has been given to it by this statute, and plaintiff's rights are governed and measured by the provisions thereof. A critical examination of this act, therefore, becomes necessary.

Section 1 prescribes as follows: viz.: " The Onondaga County Suburban water company, its successors and assigns, may, for the purpose of supplying pure and wholesome water to municipalities and their inhabitants, under the restrictions and conditions hereby imposed, increase the water storage capacity of Otisco lake so as to impound therein an additional supply of water; take and conduct water therefrom equal in amount to the additional supply so impounded; and construct, place and maintain such wall, dam, intake pipe, gate house, gate and structures as may be necessary for such purpose."

Sections 2 and 3 require that all structures shall be built in accordance with plans and specifications approved by the State Engineer and Surveyor, and that they shall be under the control of the Superintendent of Public Works so long as water from the lake shall be required for the Erie canal, and that that official shall have the power to regulate the flow of the water from the lake into the intake pipe.

Section 4 reads as follows: " Before any dam or structure hereby authorized shall be constructed or any water shall be so taken from said lake, said company, its successors or assigns, shall extinguish the riparian rights of the owners of property upon the shores of said lake and the outlet thereof affected by the proposed storage and use of said water or obtain their consents thereto. Said company, its successors and assigns, shall at all times protect and save

harmless the state of New York from and against all claims and demands of riparian owners upon said lake and outlet and all loss or damage occasioned by any act or structure hereby authorized."

The provisions of section 5 are not important here.

There can be no doubt but what the Legislature had the right to determine and prescribe the conditions under which the water company could exercise the right of eminent domain. The stringent character of the power of condemnation demands a strict compliance with all such conditions and requirements. (*Schneider* v. *City of Rochester*, 160 N. Y. 165, 172; *Matter of Poughkeepsie Bridge Co.*, 108 id. 483.)

It becomes necessary, therefore, to determine just what the Legislature meant by the language used in section 4 of the act of 1907, and just what requirements plaintiff must meet before it can take the property of the riparian owners on the outlet by condemnation.

Every owner of lands along the banks of a running stream, whether navigable or not, has a right to the use of the water which flows down the stream past his lands in the manner in which it is accustomed to flow, without diminution or alteration. That right is a part of the estate of the owner, and is an incident to his ownership in the bank. It is a right which can be severed from the land and taken by grant or by condemnation. (*United P. B. Co.* v. *Iroquois P. & P. Co.*, 226 N. Y. 38; *Matter of Van Etten* v. *City of New York*, Id. 483.)

The act in question gave the plaintiff one of two options: (1) To extinguish the riparian rights of the owners of property upon the outlet affected by the proposed storage and use of the water; or (2) obtain their consents thereto.

The mill owners have never given their consent to the diversion of the additional 6,000,000 gallons a day desired. Therefore, before any part thereof can be appropriated, the plaintiff must " extinguish the riparian rights " of the defendants " affected by the proposed storage and use of said water." Does that mean, as claimed by the defendants, every vestige of riparian rights which they have upon Nine Mile creek, or does it mean, as claimed by the water company, only such rights as the defendants have in the 6,000,000 gallons per day, which the plaintiff seeks to appropriate?

A literal reading of the language employed upholds plaintiff's contention. " Before  *  *  *  any water shall be so taken from said lake, said company  *  *  *  shall extinguish the riparian rights of the owners of property upon the shores of said lake and the outlet thereof *affected by the proposed  *  *  *  use of said water.*" The Legislature does not say *all* rights of the riparian owners; it only

mentions the rights which are affected by the proposed use of said water. What water? The water which has just been mentioned; the water to be taken — in this case the 6,000,000 gallons per day. This, it seems to me, is the natural and reasonable construction to be put upon the language used. The interpretation sought to be given to it by the defendants would be forced.

The cardinal rule underlying the construction of a statute is to ascertain and follow the intent of the Legislature. That is usually done by a literal reading of the language of the act. Where the words used do not accurately express that intention, then the language used must yield to the intent of the law-making body, when that has been ascertained. (*People ex rel. 23rd St. R. R. Co. v. Comrs. of Taxes of N. Y.*, 95 N. Y. 554, 558; *Farmers' Bank v. Hale*, 59 id. 53, 57; *People ex rel. McNeile v. Glynn*, 128 App. Div. 257; *City of Rome v. Whitestown Water Works Co.*, 113 id. 547, 554; *Matter of Armitage v. Board of Education*, 122 Misc. 586, 589; affd., 210 App. Div. 812; affd., 240 N. Y. 548.)

Ordinarily, one is required to pay for what he buys and no more. If a person purchases a limited amount of another's property, it is not customary to compel him to extinguish the owner's interest in that which is left as well as that which is taken. If defendants' interpretation of this statute is correct, what is there about the situation here which induced the Legislature to vary the common and habitual practice in this regard, and compel the plaintiff to condemn and pay for property for which it has no desire, and which in fact it was forbidden to take or use? It must be remembered that the only water which the plaintiff could possibly draw out of the lake was the flood waters which it put there by raising the dam. Plaintiff had no right to divert a single drop of the water which would have remained in the lake if no dam had been built at the outlet, or if the dam had remained at the same height as the one built and maintained by the State. If defendants' contention is correct, there must have been some impelling motive to have induced the Legislature to make as a condition to the appropriation by plaintiff of a part of the riparian rights of the mill owners the duty of paying, not only for the amount which plaintiff was given the right to take, but also for defendants' interest in the water which remained and which would flow past their mills after the appropriation. Defendants say that this motive was to protect the State against claims for damage. In the first place, it is difficult to see how the State would be liable for damages by simply giving to the plaintiff the right to impound the flood waters of the watershed and then divert the same through its pipe line. It is true that in 1897 and again in 1899 certain of these

defendants filed claims against the State for damages sustained by them by reason of the interference by the State with the natural flow of the water from the lake into the outlet. It was alleged that the State closed the gates in the bulkhead and impeded and obstructed the natural flow of the water from the lake down the creek, and deprived the claimants of the water power to which they were entitled as riparian owners on the stream. An award was made, which was affirmed by the Appellate Division. The State was held liable because of an overt act on its part, by which the right of the riparian owners on the outlet to the enjoyment of the undiminished and undisturbed flow of the water in the stream was interfered with. That is a far different situation than would exist where the State is passive and simply gives permission to another to impound and take the flood waters of the basin, and where the actual interference with the natural flow of the stream is caused by some overt act of the permittee.

But, at any rate, the State could not be held liable for any greater damage than the mill owners actually sustained, and they could only be injured to the extent of the water of which they were deprived. If the plaintiff pays that damage, and that will be determined in these proceedings and must be paid, then the defendants could have no possible claim against the State.

Again, only such property as is necessary for the public use can be taken by the power of eminent domain. (*Matter of Hopper* v. *Britt*, 203 N. Y. 144, 149; *People* v. *Fisher*, 190 id. 468, 477; *Ontario Knitting Co.* v. *State of New York*, 147 App. Div. 316, 320; affd., 205 N. Y. 409.)

Here, the taking of all of defendants' property rights is not necessary. If that were attempted, and defendants should resist upon the ground that public use did not warrant the appropriation, an issue would be raised which would be perplexing, to say the least. The language of the act leads me to doubt that the Legislature ever intended to put the plaintiff in such a position.

It is also important to bear in mind that defendants' mills are located down the stream some eight miles from the end of the lake. The waters which flow by their property come not only from the lake itself, but also from the watershed and drainage below the dam. The drainage basin above the dam is forty-four and seven-tenths square miles, and that between the dam and the village of Marcellus, just south of defendants' mills, is twenty-seven square miles. The diversion by the plaintiff of any water from the lake can in no way affect the quantity of water in the stream which comes from the drainage basin or area below the dam. It cannot be that the Legislature intended to impose upon the water

company the duty of extinguishing the rights of the defendants to the flow of the water from the shed below the dam, as a condition for taking any part of the lake. The defendants urge that our law-making body evidently considered that the water flowing into the stream from the country below the dam was of but little value, because it could not be regulated. The defendants say that the value of water in connection with the operation of a mill lies in the constancy of the flow; that figures giving the total flow of water from a given watershed are meaningless for power purposes. While it is undoubtedly true that an erratic flow of a stream is not as valuable as a constant one, it must be conceded that the large amount of water coming from the area below the dam has some value. It constitutes a substantial part of the water flowing down the creek past defendants' mills. If defendants' construction of this provision is correct, plaintiff must extinguish and pay for their interest in such water as a condition precedent to its right to acquire by eminent domain the privilege of taking the additional 6,000,000 gallons of water which the plaintiff has impounded in the lake. Such a requirement would be unreasonable, and I do not believe that the Legislature had it in mind when it passed the act in question.

Defendants urge that the word " extinguish," as used in the statute, means " to put an end to; " that it signifies a complete and entire wiping out of the thing in controversy. That is true. But, in this instance, it does not mean a complete annihilation of every right which the mill owners have in the waters of the stream passing their doors, but only of such rights as are affected by the diversion of the 6,000,000 gallons of water per day.

The defendants insist that the decision of the late General Term, Fourth Department, in the case of *City of Syracuse* v. *Stacey* (86 Hun, 441), is decisive of the point in issue here, and is binding on this court. In that case the court had under review the statute permitting the city of Syracuse to divert so much of the waters of Skaneateles lake as might be necessary to furnish a water supply for the city of Syracuse. (Laws of 1889, chap. 291, as amd. by Laws of 1890, chap. 314.) The city was then attempting to condemn a part of the riparian rights of the mill owners along the outlet of the lake, and it was held that, under the provisions of that statute, the city, before it could take any water from the lake, must extinguish all of the rights of such owners.

The binding effect of that decision here depends upon the similarity of the two statutes. Plaintiff insists that there are outstanding distinctions between the two acts; defendants, on the other hand, urge that the difference in phraseology is slight and

meaningless, and that the two acts are so similar that a judicial interpretation of one is a binding construction of the other.

For the purpose of comparison, I quote, side by side, the pertinent parts of the two statutes.

*Skaneateles Act.*

" Before any water shall be taken * * * the city of Syracuse shall acquire or extinguish all water-power rights upon the outlet of said lake to be affected by the proposed storage of water."

*Otisco Act.*

" Before * * * any water shall be so taken from said lake, said company * * * shall extinguish the riparian rights of the owners of property upon the shores of said lake and the outlet thereof affected by the proposed storage and use of said water, or obtain their consents thereto."

It will be noted that in the Syracuse-Skaneateles act the statute uses the word " all; " the city is required to acquire or extinguish " all water-power rights upon the outlet." In the Otisco act the word " all " is missing; the plaintiff is required to " extinguish the riparian rights of the owners * * * affected by the proposed storage and use of said water." The use of the word " all " in the Skaneateles statute, and its omission in the 1907 act, is, to my mind, very significant.

There are other marked distinctions. In the Otisco act the plaintiff can only take the waters impounded by the dam which it constructs; it can never deprive the mill owners of the water which would flow from the lake had the dam remained at the height of the old State dam. In the Skaneateles statute there is no limit to the water which the city of Syracuse can draw from the lake, provided such water can be passed through a main not to exceed thirty inches in diameter. Syracuse could drain the lake, if it could get the water through a thirty-inch pipe.

It must be remembered that the Skaneateles statutes were passed in 1889 and 1890. The *Stacey Case (supra)* was decided in 1895. *Sweet* v. *City of Syracuse* (129 N. Y. 316), in which the constitutionality of the act was upheld, and in which the court calls attention to the fact that before any water was withdrawn from the lake the city must acquire or extinguish all water power rights upon the outlet to be affected by the proposed storage, was decided by the Court of Appeals in 1891. The Legislature, when it gave to the plaintiff permission to take water from Otisco lake, had the Skaneateles act, and the various decisions of the courts relating thereto, in mind. The fact that different language was used in the two statutes is significant, and the omission of the word " all " from the act in question especially deserves to be considered. If

the Legislature, when it passed the 1907 statute, intended that every interest of the mill owners, not only their rights affected by the diversion of the water to be taken, but also those which they had in the water which would be left, should be wiped out and paid for, in event that they refused their consent to the appropriation of the amount of water desired, it would seem as if the language of the Skaneateles statute would have been used, so far as the same was appropriate.

An examination of the record and briefs of counsel in the *Stacey* case fail to show any mention of the flow into the outlet from the watershed below the lake; that question was not raised. The same is true of the *Sweet* case. While the opinion in the latter case mentions the fact that the mills are located on the stream between the lake and the canal, the record seems to be silent as to how much of the water flowing past the mill owners' property, if any, comes from the watershed below the end of the lake. As a matter of fact, the mills on the Skaneateles outlet are much nearer to the lake than defendants' mills are to Otisco lake.

I have reached the conclusion, therefore, and I think not wrongly, that the act in question requires the plaintiff to extinguish only such rights as the defendants have in the 6,000,000 gallons per day, which plaintiff desires to withdraw from the lake, and not the entire right which defendants have to every drop of water flowing down the stream past their mills. If I am right in this conclusion, plaintiff has complied with all the requirements of the act of 1907 to enable it to maintain these proceedings.

The consents of the Water Power and Control Commission, and of the Superintendent of Public Works, were given on condition that the plaintiff complied with the requirements of the 1907 statute. No further conditions were imposed.

This brings us to the second objection to plaintiff's recovery urged by the defendants in their brief. It is said that the petition is fatally defective because the property sought to be condemned is not described with reasonable certainty. Section 4 of the Condemnation Law prescribes that proceedings of this nature shall be commenced by the presentation to the court of a petition which sets forth " a specific description of the property to be condemned, and its location, by metes and bounds, with reasonable certainty." Accuracy in the description of the property to be acquired is necessary to preserve the rights of all parties. (*Bell Telephone Co.* v. *Parker*, 187 N. Y. 299; *Hayden* v. *State*, 132 id. 533; *Matter of N. Y. C. & H. R. R. R. Co.*, 70 id. 191.)

The property desired to be taken in these proceedings is described in the petition as follows, viz.: " All right, title and interest of the defendant in and to the riparian rights affected by the diversion

and use by plaintiff of six million gallons of water per day of twenty-four hours each, from Otisco Lake in addition to the existing rights of the plaintiff in the waters of said lake and outlet thereof, and watershed, upon, along and over, contiguous and appurtenant to the lands and premises," which are specifically described by metes and bounds.

It is easy to describe a parcel of land with precision and by metes and bounds. It is more difficult to thus definitely describe water. However, the requirement as to description applies to every form of property to be taken. Water cannot be measured by the acre or the foot, but, if it be running water, it can be measured by quantity. If the entire water in a lake or stream is to be appropriated, a statement to that effect would be a specific description. If less is to be appropriated, the specific description should be by quantity — so many cubic feet or so many gallons in a given time. That was what was done here, and I think that the description of the property sought to be condemned is described in the petition with reasonable certainty. It is difficult to imagine how it could have been designated with greater precision. (*Village of Champlain* v. *McCrea*, 165 N. Y. 264, 267, 268; *Matter of Malone Water Works Co.*, 15 N. Y. Supp. 649.)

While the underlying issue of a complete extinguishment of defendants' rights as riparian owners upon Nine Mile creek, and the insufficiency of the description in the petition of the property to be taken, are the only questions urged in defendants' brief, they did not waive the other objections raised upon the return of the notice. I have not overlooked these various objections. It fully appears that public use demands the acquisition of the 6,000,000 gallons of water per day in dispute. An effort has been made in good faith to acquire defendants' rights, and such efforts have failed. I think that plaintiff has fully complied with all the preliminary steps necessary to entitle it to a judgment of condemnation.

I admitted certain testimony and received in evidence certain exhibits, subject to a motion to strike out, which was made at the close of the case. Decision of that motion was reserved. I now deny plaintiff's motion to strike out this evidence, and give plaintiff an exception to my ruling. This evidence was not received to vary the terms of a written instrument, but rather to explain its meaning. For this purpose I think that it was competent. (*Kitching* v. *Brown*, 180 N. Y. 414; *Hoisting Engine Sales Co.* v. *Hart*, 237 id. 30.)

Judgment of condemnation and order appointing commissioners of appraisal granted.